UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                            :
UNITED STATES OF AMERICA,                                   :
                                                            :          22 Cr. 260 (PAE)
                            -v-                              :
                                                            :          OPINION & ORDER
RYAN LITTLE,                                                 :
                                                            :
                            Defendant.                      :
                                                            :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion by defendant Ryan Little to suppress (1) two out-of-court

identifications of him by civilians immediately following the April 20, 2022 Hobbs Act robbery

that forms one charge against him, and (2) any in-court identifications of Little by these civilians.

*See* Dkts. 17–18 ("Motion"). Little contends that the identifications resulted from unduly

suggestive procedures and that their admission would violate his Fifth Amendment due process

rights. For the reasons that follow, the Court denies the motion.

I.      **Overview and Procedural History**

On May 4, 2022, the Grand Jury returned a three-count Indictment. Dkt. 5. It charged

Little with: (1) Hobbs Act robbery, in violation of 18 U.S.C. § 1951; (2) using a firearm in

relation to a crime of violence (the robbery), in violation of 18 U.S.C. § 924(c)(1)(A)(i)–(ii); and

(3) being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2). *Id.*

The charges arose from events between approximately 10:30 p.m. and 11 p.m. on April

20, 2022, when a masked man robbed the cashier (Delfino Rosas Zurita or "Rosas") of Jimbo's

Hamburger Palace ("Jimbo's"), an upper Manhattan restaurant, at gunpoint. Restaurant workers

pursued the robber toward Saint Nicholas Park ("the Park"). During the pursuit, a man—whom

the Government contends was the robber—attempted to steal a car from an Uber Eats delivery

driver (Sharif Hamisu), also at gunpoint.  After Hamisu escaped the car with the keys, disabling

the vehicle, the man fled into the Park.  Police later apprehended and arrested Little in the Park.

Soon after the arrest, first Rosas and soon thereafter Hamisu approached the scene and identified

Little as the perpetrator of the restaurant robbery and the attempted car theft, respectively.

On August 19, 2022, after Rule 16 discovery, Little moved to suppress the identifications

by Rosas and Hamisu, Dkt. 17, and filed a memorandum of law, Dkt. 18 ("Def. Br."), and

exhibits, in support.  He argued that the identifications resulted from unduly suggestive

identification procedures and lack indicia of reliability.  Def. Br. at 3–5.  On August 29, 2022,

the Government filed a memorandum of law in opposition.  Dkt. 20 ("Gov't Opp. Br.").

On October 12, 2022, the Court held a suppression hearing, at which it heard testimony

from four witnesses, received documentary and photographic evidence, and heard argument.

The Court invited briefing, including on whether the identifications had resulted from police-

arranged identification procedures.  On October 26, 2022, the parties submitted post-hearing

briefs.  Dkts. 29 ("Gov't Br."), 30 ("Def. Ltr. Br.").

## II.     Factual Findings

### A.     Evidence Considered

The Court finds the following facts based on the evidence adduced at the suppression

hearing.  *See* Hearing Transcript ("Tr.").  The evidence consisted of the testimony of (1) police

officer Timothy Jacquez, a three-year New York City Police Department ("NYPD") veteran,

who responded to the robbery of the restaurant, Tr. 11–12; (2) police officer Jorge Ponce, an 18-

year NYPD veteran, who arrived on the scene of Little's arrest, Tr. 38–39; (3) Rosas, the cashier

at Jimbo's at the time of the April 20, 2022 robbery, Tr. 90–91; and (4) Hamisu, the Uber Eats

driver whose car the suspect attempted to take at gunpoint that same evening, Tr. 52–54.  Unless

otherwise indicated, the Court credits the testimony cited herein.  The Court also received a map

of the area surrounding Jimbo's and the Park, GX101; surveillance video footage capturing

aspects of the events at issue, GX205, 206A, 206B, 207A, 207B[1]; video footage from law

enforcement body-worn cameras, GX201A, 201B, 202A, 203A, 204A; and a stipulation as to

certain exhibits, GX301.  *See generally* Tr. 19–21 (introducing evidence).

### B.  Facts Established[2]

#### 1.  Rosas

##### a.  The Robbery

On April 20, 2022, at approximately 10:30 p.m., Jimbo's was robbed.  Tr. 91–94; GX205

00:14–1:46.[3]  Jimbo's is located on Amsterdam Avenue, between West 126th and 125th Streets.

Tr. 13.  At the time of the robbery, Rosas was working the register.  Tr. 100.

The robber entered Jimbo's and told Rosas that he was picking up an order.  Tr. 93.  He

was wearing a bright blue sweatshirt, with the hood pulled over his head, a face mask, a black

baseball cap, and blue jeans.  GX205 00:14–1:46; Tr. 35.  He exited before entering the

restaurant a second time—this time, holding a gun under a newspaper.  Tr. 93; *see, e.g.*, GX205

1:36–46.  The robber whispered to Rosas to hand over all the cash and, Rosas testified, raised the

---

[1] The parties stipulated that, if called, Alvin Hunt, an NYPD detective, would testify that the timestamps appearing on the footage of GX206A and GX 206B were approximately one hour behind the time of the events depicted, *see* Tr. 19, and those on the footage of GX207A and GX 207B were approximately 26 minutes ahead of the time of the events depicted, Tr. 19–20.

[2] On a suppression motion, the Government bears the burden of proof by a preponderance of the evidence.  *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010).

[3] Unlike the other video exhibits, which are the actual surveillance or body camera footage, GX205 is a video of a surveillance video.  Accordingly, the Court refers to the timestamps of the video file, as admitted in evidence, not the timestamp that is partially visible on the underlying surveillance footage.

gun toward Rosas's face. Tr. 93. Rosas handed over the cash. Tr. 93. The robber then fled on foot. *See* Tr. 93. Rosas jumped over the counter and ran after the robber. Tr. 93–94, 100–01. Four other restaurant employees also pursued the robber—two on bikes, and two on foot. Tr. 112.

### b.   The Chase

Rosas chased the robber north along Amsterdam Avenue, toward the Park, and then to the right, along West 128th Street. Tr. 101. He stopped to speak to an officer in a police vehicle on West 128th Street and reported the direction in which the robber had run, and that the robber was "removing his clothes" as he fled; Rosas did not report that the robber had been wearing a blue sweatshirt. Tr. 101–02. Rosas saw the robber turn left onto Convent Avenue and then right onto West 129th Street, but then lost sight of the robber. Tr. 103, 105. Rosas continued down West 129th Street, until it intersected with Saint Nicholas Terrace, but did not see the robber again during this period. Tr. 105. Two streets border the Park—Saint Nicholas Terrace on the west, and Saint Nicholas Avenue on the east. *See* GX101 (aerial map). The Park slopes downward from west to east, forming a "substantially steep hill." Tr. 31.

Upon arriving at Saint Nicholas Terrace, Rosas encountered other restaurant employees who had briefly met up with police officers earlier; the employees told Rosas that the suspect had run into the Park. Tr. 105–06. The officers were no longer present. Tr. 112. Rosas instructed the other restaurant employees to "go around" the Park, from their current location on the Park's western side—that is, Saint Nicholas Terrace—to the eastern side—that is, Saint Nicholas Avenue. Tr. 113. Rosas himself entered the Park from its western side on Saint Nicholas Terrace, crossed the Park on foot, and emerged on its eastern side on Saint Nicholas Avenue. Tr. 113. There, Rosas encountered police officers. *See* Tr. 113.

Rosas got into a police vehicle at Saint Nicholas Avenue and 130th Street and drove back into the Park with the officers—this time, crossing the Park from east to west. Tr. 113. Rosas understood the officers to be looking for the robber. Tr. 114–15 ("Q: [Y]ou knew the officers were looking for the perpetrator, correct? A: Yeah, I had already told them that he had gone into the park."). Rosas described the robber's pants and shoes to the officers and told them the robber had been "running" and "removing his clothing" after the robbery and had entered the Park. Tr. 114. Rosas did not tell the officers that the robber had been wearing a blue sweater. Tr. 114. While in the car, Rosas could hear officers talking to each other over their radios. Tr. 114.

Rosas exited the police car at 129th Street and Saint Nicholas Terrace on the western side of the Park. Tr. 115. Rosas reentered the Park, with the police officers. Tr. 115. As they crossed the Park, Rosas heard yelling from Saint Nicholas Avenue and the officers' radio traffic on their handheld radios. Tr. 116. He also saw lights shining through the trees from Saint Nicholas Avenue below—from the unfolding arrest. Tr. 119. Rosas tried to run down to Saint Nicholas Avenue and follow the officers to the source of the commotion, Tr. 118, but the officers refused to allow him over a railing or wall that separates the Park from the street, Tr. 117 (describing railing); Tr. 120–21 (describing wall); *see* Tr. 120–21 ("Q: So the officers told you not to go over that fence? A: Yes."). Rosas waited until the officers had gone ahead and then, without informing them, jumped over the railing and onto Saint Nicholas Avenue. Tr. 117 ("Q: You told the officers that you were going to go around down to the Avenue, right? A: No, I didn't tell them anything."); Tr. 118 (testifying that he got to Saint Nicholas Avenue by jumping over the barricade, "just like the police officers had done, but once they were already down there").

After jumping over the railing or wall, which he estimated was approximately five feet tall, Rosas rejoined the other restaurant employees. *See* Tr. 121. They told Rosas that the police had waited for additional officers because they had believed that the suspect was armed, but that they had since caught a suspect, taken money from him, brought him out of the Park, and found a gun. *See* Tr. 121–22. The other employees also told Rosas that they had seen the suspect as he was removing clothing from his backpack. *See* Tr. 122.

Rosas ran up to the arrest scene. Tr. 121. The body camera footage shows Rosas running to the scene and positively identifying Little before speaking to any officer.[4] *See* GX201A 22:53:19–40. Rosas testified that he recognized Little as the robber based on his pants and shoes. Tr. 124 ("Yes, just [his pants and shoes], because I did not see his face or his—how he was wearing his hair because it was covered up.").

### 2.    Hamisu

#### a.    The Hold Up at Gunpoint

Shortly after 10:30 p.m. on April 20, 2022, Hamisu's car was parked at West 128th Street, between Convent Avenue and Saint Nicholas Terrace. Tr. 53, 57. He was working that evening delivering Uber Eats orders and had just made a delivery. Tr. 54; GX207A (surveillance footage showing food delivery and idling car). Hamisu was sitting in his car when he saw a stranger approach on the sidewalk. Tr. 54. The man entered Hamisu's car through the passenger door,

---

[4] Rosas's suppression hearing testimony can be read to suggest that, before he identified Little, an officer had asked if he was the person who had been robbed. Tr. 123. It is not clear whether Rosas intended to convey this. Moreover, the body camera footage contradicts this chronology. *See* GX201A 22:53:19–40. In any event, even if an officer had asked Rosas whether he was the robbery victim, that inquiry, which suggested the fact of a robbery but not the robber's identity, would not have made the circumstances of the identification unduly suggestive.

as Hamisu sat in the driver's seat.  Tr. 54–55; GX207B 23:03:35–55 (surveillance footage

showing same).  Hamisu's car has an internal light that turns on when the door is opened.  Tr. 68.

     Hamisu testified that the man was holding "something black on his hand"—possibly "a

shirt or something"—was wearing a black hoody with the hood over his head, and had his hair in

a braid.  Tr. 55.  The man said to Hamisu: "Take me to the next street.  Someone is going to kill

me."  Tr. 55.  Hamisu refused and asked the man to get out of his car.  Tr. 56.  The man then

pulled a gun on Hamisu.  Tr. 56.  Hamisu exited through the driver's door, circled around its

front, and then backed away toward the rear of the car.  GX207B 23:03:55–04:22; Tr. 56, 76.

Hamisu had the car key.  Tr. 76.  As Hamisu backed away from his car, he saw the man move

himself to the driver's side of the vehicle and try to start the car, but Hamisu had moved too far

from the car for the key to function remotely, and the car would not start.  Tr. 56–57 ("[T]he

engine goes off."), 76.  The man exited the car and ran toward the Park.  Tr. 57, 77 ("He run

across to Saint Nicholas Terrace, to the park.").  Hamisu ran slightly further down West 128[th]

Street, GX206B 21:38:24–33, to see which direction the man had headed, before returning to his

car, Tr. 77–78.

     During this sequence, Hamisu turned "to watch Convent Avenue . . . [to] see help or

something like that," Tr. 56, and saw a police car and two "Spanish guys" approaching and

apparently pursuing the perpetrator, Tr. 58–59 ("I think they were chasing [the man who held up

Hamisu]. . . . So I saw them on Convent Avenue coming."); *see also* Tr. 59 ("Q: Were they

moving toward Saint Nicholas Terrace? A: Yeah.").  Hamisu waved them to come help him, Tr.

57, and pointed in the direction of the fleeing perpetrator.  *See* GX207B 23:04:15–29; *see also*

GX207B 23:04:10–39 (showing perpetrator fleeing, Hamisu circling car while waving and

pointing after perpetrator, and police vehicle driving after perpetrator).  The police car and other

men followed the perpetrator; Hamisu took a few steps after them before turning and returning to his car. *See* GX206B 21:38:15–29; GX207B 23:04:45–59.

*b.*    *The Chase*

Hamisu drove his car from West 128th Street to Saint Nicholas Avenue. Tr. 63. He did not make any stops, but there was traffic. Tr. 79. When he saw police gathered, Hamisu parked his car and approached the scene on foot. Tr. 80–81.

**3.    The Police Officers' Actions Before the Identifications**

*a.*    *Officer Jacquez's Conduct Prior to the Identifications*

At approximately 10:35 p.m., Officer Jacquez was notified that a restaurant employee had called 911 to report a commercial robbery in progress, *see* Tr. 14, involving a firearm, Tr. 33 ("The initial 9-1-1 call, I believe had stated that a firearm was displayed."). Officer Jacquez responded to Jimbo's approximately three minutes later, Tr. 24, in an unmarked vehicle, Tr. 13. His partner and his boss were also in the vehicle. Tr. 17. Officer Jacquez was in the passenger's seat. Tr. 13.

Upon arriving at Jimbo's, Officer Jacquez spoke with three or four restaurant employees who had gathered outside the restaurant. Tr. 25–26. They described the robber as wearing a blue sweater, black hat, black ski mask, and backpack. Tr. 25. The employees told Officer Jacquez that the perpetrator had run north along Amsterdam Avenue toward Saint Nicholas Terrace. Tr. 14–15. One employee, who stated he had seen the robbery, got in the unmarked police car, Tr. 26, and drove with Officer Jacquez, Jacquez's patrol partner, and Jacquez's boss from Jimbo's to the Park entrance, Tr. 16–17. Officer Jacquez testified that, while they were driving to the Park, the employee confirmed that he had seen a silver firearm underneath a

8

newspaper during the robbery, and that the robber had fled toward the Park.[5] Tr. 17; *see also* Tr. 32–33 ("[The employee] confirmed with us that [a firearm] was actually displaced, and he described it as a silver firearm."). Officer Jacquez stated that the employee had also begun describing the perpetrator's clothing, including a black hat, black mask, blue hoody, and backpack. Tr. 34–35. As of the suppression hearing, Officer Jacquez could not recall if the employee who drove with him was the person working the cash register during the robbery. Tr. 33.

When they reached the Park, Officer Jacquez and the employee who had ridden with the officers exited the car and approached two other restaurant employees who had chased the suspect from Jimbo's. Tr. 30; *see also* Tr. 17 ("These workers were running behind him the entire time . . . they pointed out a general area where he might have been inside the park."). Officer Jacquez spoke to the employees, one of whom stated that he had chased the suspect into the Park and that the suspect was "somewhere in the bushes." Tr. 30; *see also* Tr. 15. The employees pointed to a specific area where they believed the suspect had fled. Tr. 17. Officer Jacquez and his partner entered the Park from Saint Nicholas Terrace, on the Park's western side, between West 129th and 130th Streets, and ran toward the area the employees had indicated. Tr. 17–18. As they ran into the Park, Officer Jacquez and his partner heard multiple officers on the opposite, eastern side of the Park yelling "get down, get down, let me see your hands," and Officer Jacquez noticed a silver firearm on the ground. Tr. 18.

---

[5] The employees' statements to Officer Jacquez were not objected to as hearsay. In any event, (1) these statements were received at the hearing not to establish the truth of the matters asserted, but for the non-hearsay purpose of explaining the information known to the officer; and (2) "the rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine admissibility of evidence." *United States v. Matlock*, 415 U.S. 164, 172–73 (1974).

b.     *The Arrest*

At approximately 10:53 p.m., GX201A 22:53:23 (Little in handcuffs), law enforcement officers arrested Little on the sidewalk of Saint Nicholas Avenue between 132nd and 135th Streets, on the east side of the Park, Tr. 39. Officer Ponce reported to the scene as Little was being placed in handcuffs. Tr. 39–40. His role was to provide security for the officers executing the arrest. Tr. 40. He testified that he believed that Little was the suspect before Rosas's identification because Little's clothing met the description provided. Tr. 51.

c.     *Rosas's Identification*

Rosas ran up to the arrest scene from the south with other restaurant employees. GX201A 22:53:19–25; *see also* Tr. 40–41 (Officer Ponce testimony that Rosas approached from the south with coworkers). Officer Ponce did not recall asking Rosas any questions before the identification and testified that no other police officer asked Rosas questions. Tr. 41. Officer Ponce's body camera footage shows that, immediately before Rosas identified Little, Officer Ponce pointed to his right and said, "Is that them?" GX201A 22:53:29–33; Tr. 45 ("[T]hat was my voice."). But the footage shows that Officer Ponce's pointing finger was not directed at Little, Tr. 48 ("Q: [W]hen your hand is on the screen, it does not appear to be pointing to the suspect on the ground to the left, but it appears to be pointing more in the distance somewhat to the right? A: Right."), but northward along Saint Nicholas Avenue, Tr. 48 ("I'm pointing more towards the right."); *see* GX201A 22:53:29–33. Asked at the hearing to whom he was referring, Officer Ponce stated he could not recall, but that he believed he was referring to the transport vehicles; he based this conclusion on the direction in which he was pointing in the footage, his recollection that most police vehicles were north of the arrest scene, and his contemporaneous understanding that the suspect needed to be brought to the precinct as quickly as possible. Tr.

10

47–49. Officer Ponce testified that his question was directed to his partner. Tr. 49. On cross-examination, Officer Ponce testified that Little was ultimately brought to a transport vehicle south of the arrest location on Saint Nicholas Avenue. Tr. 50.

Rosas, in Spanish, identified Little as the Jimbo's robber. Tr. 41; GX201A 22:53:33–41. Rosas testified that he had never seen the perpetrator before the robbery, Tr. 111, and that he recognized Little "because of the pants and the shoes he [was] wearing," Tr. 98. It was 10:53 p.m. GX201A 22:53:35 (Rosas identification); GX301 (stipulation that timestamps on body camera footage are accurate).

*d.    Hamisu's Identification*

About a minute after Rosas's identification, at 10:54 p.m., Hamisu approached the arrest scene. GX202A 22:54:29. Hamisu testified that, as he walked up to the arrest scene, no one approached him, asked him to identify the arrested person, or otherwise questioned him. Tr. 64–65. Hamisu was on the same sidewalk as the arrest scene. Tr. 65. Body camera footage shows Hamisu walking up to a group of approximately eight police officers while the arrest was ongoing. *See* GX202A 22:54:29–33; *see also* Tr. 82 ("There were a bunch of police, but nobody came to me. I was talking.").

Hamisu positively identified Little. *See, e.g.*, Tr. 83–85; GX203A 22:54:43–50 ("He came and sit inside my car. . . . He was the one. He was pointing a silver gun."). Hamisu testified repeatedly that no police officer questioned him prior to that identification, and that he was speaking to himself when he identified Little. Tr. 64 ("Nobody approach me, so I was saying it, he was the one who entered my vehicle."), 66–67 ("Q: [W]ere you talking to yourself or somebody else? . . . A: I'm sorry, I'm not speaking to anybody. Like I just came, and I just say, oh, he was the one who entered my car. I was not communicating to nobody."); 81 ("I'm

11

not talking to anybody."); 85 ("I was not telling [the officer]. I was speaking."). The body camera footage shows that an officer spoke to Hamisu as he was identifying Little—and seemingly, at first, heard Hamisu as stating not that the suspect had tried to take his car, but that Hamisu had gotten locked out of the car. *See* GX203A 22:54:34–40 (officer walks over to Hamisu, and then off-screen voice can be heard asking, "You locked out of your car?" before the same voice repeats, "He took your car"). Hamisu testified that this police officer instructed him to move back "because they don't want nobody to come close" to the arrest. Tr. 83–84; GX203A 22:54:43–46 (officer saying to Hamisu, "Just stay here. Don't worry, okay?").

Hamisu testified that he believed that Little was the same person who had entered his car based on his clothing—a black hoody—and braids. Tr. 63–64. At the time of his identification, Hamisu was standing fewer than eight feet from the police. Tr. 66. After he identified Little, a police officer asked Hamisu to follow them to the precinct and give a statement, which he did. Tr. 67; *see also* GX 203A 22:54:49–55 (one officer tells another to "get his name and all his info" while pointing at Hamisu).

## III.   Discussion

### A.    Overview

Little's motion to suppress implicates multiple issues. A threshold issue is whether the identifications were the product of "identification procedures" arranged by law enforcement, so as potentially to implicate the right to due process. That issue turns on whether law enforcement acted to arrange or solicit the identifications. If the identifications did result from police action, then, to determine admissibility, the Court must conduct the familiar two-step analysis as to (1) whether the procedures were unduly and unnecessarily suggestive, and (2) if so, whether the

12

identifications are nonetheless independently reliable. *See Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). *See generally Perry v. New Hampshire*, 565 U.S. 228, 232–33 (2012).

## B.      Identification Procedures

### 1.      Applicable Legal Principles

The Supreme Court "ha[s] not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers." *Perry*, 565 U.S. at 232. "When no improper law enforcement activity is involved," it "suffices to test reliability through the rights and opportunities generally designed for that purpose, notably the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." *Id.* at 233.

### 2.      Discussion

At the suppression hearing, the Government argued that law enforcement did not arrange any identification procedure before the identifications by Rosas and Hamisu. *See* Tr. 7, 125. Rather, it asserted, "the police were in hot pursuit" of the Jimbo's robber, and after they arrested Little, the two witnesses each "came up and made a spontaneous unarranged identification of the defendant." Tr. 125. Little countered that the identifications were police-arranged. *See* Def. Br. at 4–5 (stating officers conducted a show-up). *But see* Def. Ltr. Br. at 3–5 (discussing only Rosas). The Court addresses the victims' identifications in turn.

#### a.      Rosas

Based on the evidence adduced at the suppression hearing, the Court finds that Rosas's identification of Little was not arranged by law enforcement—let alone improperly so. *See Perry*, 565 U.S. at 232–33. For that reason alone, it is admissible; it will be for the jury to determine whether to credit the identification as reliable. *See, e.g., Marte v. Yelich*, No. 11 Civ.

13

840 (MKB), 2014 WL 2208170, at * 5 & n.1 (E.D.N.Y. May 28, 2014) (reasonable application

of federal law to admit pretrial identification where suggestiveness was not created by law

enforcement); *Mendoza v. McGinnis*, No. 03 Civ. 2598 (DC), 2004 WL 736894, at *6 (S.D.N.Y.

Apr. 5, 2004) (identification properly admitted where no police-arranged procedure).

Most probative, the body camera footage shows that Rosas ran to the arrest scene and

identified Little immediately and without prompting. *See* GX201A 22:53:33–37. It is true that

Rosas earlier had been in the company of the officers, during the initial police canvass for the

subject. But under the circumstances here, that does not make his later identification police-

arranged. Officer Jacquez credibly testified that the police invited the restaurant worker to ride

with them as part of their information-gathering process—not to transport him in the event an

arrest was later made, and an identification required. *See* Tr. 16 ("Q: And why did you have the

restaurant worker with you in the car? A: Usually in these situations, we conduct a canvass to

see if we can locate the defendant."). Even Little's summary of the police activities while

driving the worker is consistent with gathering information to help locate the suspect.[6] And

critically, the officers did *not* bring Rosas to the arrest scene.[7] Instead, they left Rosas in the

Park on the far side of a barricade, Tr. 117–18, and, far from soliciting an identification,

explicitly prohibited him from approaching, Tr. 117 ("Q: So the officers told you not to go over

---

[6] *See* Def. Ltr. Br. at 3–4 ("[O]fficers enlisted the assistance of the [restaurant] witnesses, seeking, obtaining, and relying upon information from them . . . includ[ing] descriptive details . . . where the perpetrator went, and what the witnesses had done trying to find him.").

[7] *Contra Cardova v. Lavalley*, 123 F. Supp. 3d 387, 395–96 (E.D.N.Y. 2015) (officers drove victim to arrest scene to identify suspect, but still not unduly suggestive); *Charlemagne v. Goord*, No. 05 Civ 9890 (DAB) (HBP), 2008 WL 2971768, at *13 & n.7 (S.D.N.Y. June 30, 2008), *report and recommendation adopted*, No. 05 Civ. 9890 (DAB), 2011 WL 2150646 (S.D.N.Y. May 31, 2011) (identification not unduly suggestive where police drove witness to show-up)

that fence? A: Yes."). On his own initiative, Rosas approached the arrest scene anyway. *See* Tr. 117–19 (testifying that he waited until the officers had gone down to Saint Nicholas Avenue, and then followed them over the barricade).

In these circumstances, Rosas's voluntary ascent of the barricade, approach to the scene of the arrest, and spontaneous identification of Little as the man who had robbed him at gunpoint are not attributable to law enforcement and do not implicate due process. *See United States v. Eley*, No. 29 Cr. 78-3 (AT), 2022 WL 1608068, at *5 (S.D.N.Y. May 20, 2022) (due process concerns about suggestive identification procedures arise only from "'improper *police* arrangement of the circumstances surrounding an identification'" (emphasis added) (quoting *Perry*, 565 U.S. at 242)). Where the "facts establish that [the witness] voluntarily traveled to the scene of the arrest and spontaneously identified the [defendant] while the police were otherwise engaged," there was no police-arranged procedure "that implicated the [defendant's] due process rights." *Mendoza*, 2004 WL 736894, at *6.

The possibility that officers appreciated Rosas's zeal to apprehend the man who had robbed him does not change this result or, contrary to Little's suggestion, indicate police manipulation of Rosas aimed at inducing an identification. *See* Def. Ltr. Br. at 3–4 (arguing the officers knew the restaurant employees were trying to find the robber and "harnessed that motive"). The record belies that argument. Rosas repeatedly, and credibly, testified that, after the police left him in the Park, he ran to the arrest scene without informing the officers that he was doing so and against their explicit instructions. *See* Tr. 117 ("Q: You told the officers that you were going to go around down to the Avenue, right? A: No, I didn't tell them anything."); Tr. 118 (testifying he got to Saint Nicholas Avenue by jumping over the barricade, "just like the police officers had done, but once they were already down there"); *see also* GX201A 22:53:19–

25 (depicting Rosas and co-workers running up to the in-progress arrest). And even assuming the officers sensed Rosas's interest in finding the robber, their actions were consistent with attempts to neutralize that interest, by seeking to keep him away from the arrest scene.

Finally, insofar as the defense relies on video of Officer Ponce's arrest-scene question, "Is that them?", that question was demonstrably not directed to Rosas. Officer Ponce credibly testified that he was asking his partner whether the police transport car for Little had arrived, and that he was not asking Rosas for an identification or otherwise acting to arrange an identification. *See* Tr. 47–49. The body camera footage corroborates this. It shows that, as he posed that question, Officer Ponce pointed *away* from Little, northward up Saint Nicholas Avenue, GX201A 22:53:29–33; Tr. 48; that as he spoke, another officer on the far right of the screen turned and looked in the direction Officer Ponce was pointing, GX201A 22:53:29–31; and that Rosas first arrived at the scene after Officer Ponce had finished speaking, GX201A 22:53:29–37.

> ### b.    *Hamisu*

Beyond the conclusory statement that Hamisu "stepped into an identification procedure virtually in progress," Little does not make any argument why Hamisu's identification of Little was police-arranged. *See* Def. Ltr. Br. at 3–5. In the interest of completeness, the Court has nonetheless considered the limited police actions associated with Hamisu's identification. For the reasons that follow, the Court again does not find evidence of "improper police arrangement of the circumstances surrounding [Hamisu's] identification," *Eley*, 2022 WL 1608068, at *5, or that the identification in any way resulted from a police-arranged show-up, *see, e.g.*, *Mendoza*, 2004 WL 736894, at *6; *Gilford v. Racette*, No 13. Civ. 5881 (ALC) (AJP), 2015 WL 4639975, at *15 (S.D.N.Y. Aug. 5, 2015), *report and recommendation adopted*, No. 13 Civ. 5881 (ALC),

2015 WL 7430825 (S.D.N.Y. Nov. 20, 2015) (admitting spontaneous identification and citing

authority that spontaneous identifications do not qualify as police-arranged show-ups).

Here, Hamisu clearly came to the arrest on his own initiative. He testified that he stopped

his car where he saw police gathered, Tr. 80–81, and exited the car and walked to the arrest

scene on his own volition, Tr. 80–81; *see also* GX202A 22:54:29–33 (showing Hamisu walking

up to arrest scene). There is no evidence that any police officer even appreciated at the time that

Hamisu, too, had been a target of an attempted robbery, let alone encouraged Hamisu to draw

near. *See supra*; Tr. 82 ("There were a bunch of police, but nobody came to me."). Moreover,

save waving down a police vehicle for help and pointing after the perpetrator, Hamisu appears

not to have had any contact with law enforcement before arriving—on his own steam—at the

arrest scene. *See generally* Tr. 63, 79, 80–81 (Hamisu testifying that he drove directly to arrest

scene, without making any stops or speaking to any officers). And, upon his arrival, he began

identifying Little before any officer solicited an identification from, or even spoke to, him. *See*

Tr. 64 ("Nobody approach me, so I was saying it, he was the one who entered my vehicle."), 67

(same), 81 (same), 85 (same). In fact, although imperfectly audible, the body camera footage

suggests that the officers on the scene did not even initially appreciate that Hamisu was making

an identification. Until Hamisu explained, they appear to have believed that he was locked out

of his car and seeking police assistance. *See supra* (discussing GX203A 22:54:34–40).

### C.      Due Process Assessment of the Victim Identifications

#### 1.      Applicable Legal Principles

Assuming—contrary to the finding above—that law enforcement arranged the Rosas and

Hamisu identifications, Little would have to establish more to secure their exclusion. *See*

*Raheem*, 257 F.3d at 133. "When a defendant challenges the admissibility of identification

17

testimony given by a witness who made a pretrial identification, [the Court] conduct[s] a two-part inquiry, asking first whether the pretrial identification procedures were unduly suggestive and, if so, whether the identification is 'nonetheless independently reliable.'" *See United States v. Marsh*, 644 F. App'x 5, 7 (2d Cir. 2016) (summary order) (quoting *Raheem*, 257 F.3d at 133).

As for the first part of this inquiry, a pretrial identification procedure may be found unduly and unnecessarily suggestive if it was based on police procedures that create "a very substantial likelihood of irreparable misidentification." *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009). All show-up procedures are "inherently suggestive because [they] involve[] the presentation of a single suspect to a witness by the police." *Id.* But not all show-up procedures are *unnecessarily* suggestive, so as potentially to violate due process. *See, e.g., United States v. Bautista*, 23 F.3d 726, 729–32 (2d Cir. 1994) (affirming admission of a pre-trial identification where the suspect was handcuffed, in the custody of police officers, with his face illuminated by flashlights, and each time the witness identified the suspect, an officer radioed his fellow officers, "it's a hit"), *cert. denied*, 513 U.S. 862 (1994). And if the pretrial identification is not found unduly suggestive, there is no occasion to undertake the second step and inquire whether the witness's in-court identification would nonetheless be independently reliable. *See United States v. Rivera*, No. 19 Cr. 131 (PAE), 2019 WL 6497504, at *3 (S.D.N.Y. Dec. 3, 2019). "That is because where the pretrial identification was not unduly suggestive, it does not endanger the fairness of the trial, which is the principal 'due process focus.'" *Id.* (quoting *Wray v. Johnson*, 202 F.3d 515, 524 (2d Cir. 2000)). In this circumstance, "any question as to the reliability of the witness's identifications goes to the weight of the evidence, not its admissibility." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990).

Even "[w]here the pretrial identification was unduly suggestive, exclusion of the eyewitness's identification is not automatic." *Rivera*, 2019 WL 6497504, at *3. The Court instead proceeds, at the second step, to inquire whether the witness's in-court identification would be independently reliable, so as to vitiate any taint from the suggestive procedure. *Raheem*, 257 F.3d at 135. The Court assesses independent reliability by considering five factors, known as the "*Biggers*" factors: "(1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the identification." *United States v. Arroyo*, 600 F. App'x 11, 14–15 (2d Cir. 2015) (summary order); *see also Neil v. Biggers*, 409 U.S. 188, 199–200 (1972); *United States v. Kwong*, 69 F.3d 663, 666 (2d Cir. 1995); *Jarrett v. Headley*, 802 F.2d 34, 42 (2d Cir. 1986). "[I]f the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Perry*, 565 U.S. at 232; *see also Manson v. Brathwaite*, 432 U.S. 98, 114–17 (1977) (use of unnecessarily suggestive photo array did not require exclusion of resulting identification in light of, *inter alia*, witness's ability to view the suspect at the time of the offense); *United States v. Fernandez*, 456 F.2d 638, 642 (2d Cir. 1972) (declining to suppress identification despite use of suggestive photo array where, *inter alia*, witnesses to bank robbery had excellent opportunity to view perpetrator).

### 2.    Discussion

Measured against these principles, Little's challenge to the pretrial identifications fails at the first step.

19

> a.    *Rosas*

Viewing the circumstances surrounding Rosas's identification of Little as a whole, they were not "so *unnecessarily* suggestive and conducive to irreparable mistaken identification as to be a denial of due process of law." *Richardson v. Superintendent of Mid-Orange Corr. Facility*, 621 F.3d 196, 202 (2d Cir. 2010) (emphasis added) (citation and internal quotation marks omitted).

At the outset, identifications that are serendipitous—as opposed to resulting from intentional police arrangement—are "much less likely to be suggestive or warrant condemnation" than those resulting from police misconduct. *See Brinson v. Annetts*, No. 05 Civ. 5582 (DGT), 2008 WL 4282617, at *8 (E.D.N.Y. Sept. 16, 2008).

Here, Little argues that the facts that Rosas observed him in the presence of police officers who were forcibly effectuating an arrest, and that he was handcuffed, together made the circumstances unnecessarily suggestive. *See* Def. Ltr. Br. at 7 (arguing that a forcible arrest was unnecessary); Def. Br. at 2. But these circumstances are not indicative of unnecessary police action. On the contrary, this case is of a piece with numerous others upholding on-scene witness identifications where the fast-moving nature of a police pursuit of a fleeing suspect justified the use of such restraints in the resulting arrest, and where the witness's prompt identification of the suspect, even in suggestive circumstances, was justified as a means "to quickly confirm the identity of a suspect, or to ensure the release of an innocent suspect," *Brisco*, 565 F.3d at 88. As the assembled case law reflects, where "the police are making a prompt and reasonable effort to identify the perpetrator, handcuffs and police custody are 'necessary incidents of an on-the-scene identification' that do not 'render the pre-trial identification procedure unnecessarily suggestive.'" *Goston v. Rivera*, 462 F. Supp. 2d 383, 389 (W.D.N.Y. 2006) (quoting *Bautista*,

20

23 F.3d at 730); *see, e.g., Cardova*, 123 F. Supp. 3d at 395 (same); *Reynoso v. Artus*, 722 F.

Supp. 2d 394, 403 (S.D.N.Y. 2010) (same); *Kirk v. Burge*, 646 F. Supp. 2d 534, 546 (S.D.N.Y.

2009) (same); *Mendoza*, 2004 WL 736894, at *6 (collecting cases).  Here, the incidents of arrest

that Little laments—handcuffing, police custody and presence, and flashlights—were all valid

and necessary incidents of an identification immediately following a night-time robbery that had

involved a firearm and had led to an urgent chase through an urban neighborhood and park. *Cf.*

*Bautista*, 23 F.3d at 730 (handcuffs, custody, and flashlights were necessary incidents of night-

time narcotics raid).

   That Rosas's positive identification of Little as the armed robber of Jimbo's occurred

some 30 minutes after and mere blocks from the robbery reinforces that there were good reasons

for the location of the arrest, its forcible quality, and the handcuffs and use of flashlights.  Even

assuming—contrary to the finding, *supra*—that the police intended that Rosas make an on-scene

identification promptly upon Little's seizure, any lesser mode of restraint would have been

unrealistic and arguably unsafe.  Courts have commonly upheld prompt on-scene identification

procedures in the interest of assuring that the proper person was arrested, notwithstanding such

circumstances. *See, e.g., Brisco*, 565 F.3d at 83–85 (identification permissible where officers

brought suspect one-tenth of mile down road to crime scene, approximately one hour after initial

robbery report); *Kirk*, 646 F. Supp. 2d at 539, 546 (identification within minutes not unduly

suggestive); *Cardova*, 123 F. Supp. 3d. at 395 (show-up identification not unreasonable under

settled law, in part, because mere minutes passed between crime and victim's identification);

*Corchado v. Rabideau*, 576 F. Supp. 2d 433, 450 (W.D.N.Y. 2008) (identification within 30

minutes of shooting necessary under circumstances); *Mendoza*, 2004 WL 736894, at *2, *6

(identification "within a few minutes" of radio report of burglary upheld); *Jones v. Strack*, No.

99 Civ. 1270 (AJP), 1999 WL 983871, at *11–12 (S.D.N.Y. Oct. 29, 1999) (show-up of armed robbery suspects conducted in park two blocks away and within minutes of assault was prudent police work and not unduly suggestive). As courts have recognized, identifications made in close temporal and geographic proximity to the crime scene are, absent unnecessarily suggestive circumstances, justifiable, because "[a] prompt showing of a detained suspect at the scene of arrest has a very valid function: to prevent the mistaken arrest of innocent persons," *Bautista*, 23 F.3d at 730; *see, e.g.*, *Cardova*, 123 F. Supp. 3d at 395, "while the witness's memory [is] still fresh and [evidence is] still available," *Brisco*, 565 F.3d at 91.

That Rosas had—during the chase—been in a police car with officers did not make the later identification procedure improper. *See supra.* Where officers have driven witnesses all the way to the arrest scene to undertake an identification—and such did not happen here—those identifications have been held permissible, as long as the officers did not make statements suggesting that the arrested person was the perpetrator. *See, e.g.*, *Cardova*, 123 F. Supp. 3d at 395–96 (victim identification after traveling to arrest scene with officers not unduly suggestive); *Charlemagne*, 2008 WL 2971768, at *13 & n.7 (identification not unduly suggestive where witness identified suspect at show-up location in the back of a police car but where there was no evidence that, while driving the witness to the show-up, officers made statements suggesting the suspect was the perpetrator). The suppression hearing yielded no evidence that any officer told Rosas—or exposed him to radio communications stating—either that an arrest had been made or that the arrestee was the Jimbo's robber. *See Charlemagne*, 2008 WL 2971768, at *13 n.7. Rather, Rosas testified that he independently drew the inference that an arrest had occurred when he overheard yelling on Saint Nicholas Avenue, Tr. 116, and saw lights through the trees, Tr. 119 ("Q: [W]hen you're coming through the park, you could see that there was police activity

and an arrest going on, right?  A: Yes."), and that other restaurant workers later confirmed that

an arrest had occurred, Tr. 119.[8]

Insofar as Rosas was told, before identifying Little, that the police had arrested someone

matching aspects of the robber's description, that information came from other restaurant

employees. *See* Tr. 121–22 (describing what coworkers told him).  This too, even though

suggestive, does not support suppression, as the due process limitations on the introduction of the

fruits of suggestive identification procedures do not apply "when the taint stems from the actions

of a private individual" or individuals. *See, e.g., Eley*, 2022 WL 1608068, at *5 (quoting *Dixson*

*v. Lamanna*, No. 18 Civ. 8285 (KPF) (SN), 2022 WL 19180, at *22 (S.D.N.Y. Jan. 3, 2022)); *see*

*also Marte*, 2014 WL 2208170, at *5 n.1.  Little's recourse is therefore not suppression, but to

argue, before the jury, why Rosas's identification, given the circumstances, is not reliable.

        *b.*    *Hamisu*

For similar reasons, Hamisu's identification was not unnecessarily or unduly suggestive.

---

[8] Rosas's apparently limited facility with English would further undermine any claim that he had
comprehended the content of the officers' radio communications or statements.  Rosas testified
at trial through a Spanish translator and indicated he has limited facility in English.  Officers
Jacquez and Ponce are fluent in Spanish, *see, e.g.,* Tr. 32 (Jacquez), Tr. 41 (Ponce), and Officer
Jacquez interviewed restaurant employees in Spanish earlier the evening of the robbery, Tr. 32.
But the record reflects that any communications between *officers* that night were in English—
whether over their radios, *see, e.g.,* GX 202A (background radio communications), GX203A
22:54:33–37 (same), "yelling in English" at the arrest scene, Tr. 97, *see also* GX204 22:55:18–
24 (officers speaking in English), or as reflected in the body camera footage, *see, e.g.,* GX 203A
22:54:49–55 (one officer telling another to get Hamisu's contact information in English),
including as to Officer Ponce, *compare* GX201A 22:53:29–33 (asking another officer, "Is that
them?"), *with id.* at 22:53:39–44 (speaking to Rosas in Spanish).  As Rosas testified, any
overheard police radio communications appear to have influenced his understanding of the chase
and subsequent arrest through their tone and the surrounding circumstances, rather than through
their content.  *See* Tr. 114–16 (Rosas, stating that he believed he was helping officers search for
the robber, and that he heard officers speaking by radio and while in the park); *id.* at 97 ("They
didn't yell at me.  I heard them yelling in English.").

His identification occurred in even closer time and space to the offense involving him than had Rosas's.  *Compare* GX207B 23:04:00 (Hamisu held up at gunpoint at approximately 10:38 p.m. on West 128th Street), *with* Tr. 13 (Jimbo's robbery occurred just before 10:30 p.m. on Amsterdam Avenue, between West 125th and 126th Streets).  And Hamisu did not have any conversation or contact with law enforcement before identifying Little, save when he waved to a police car for help and pointed after the fleeing perpetrator.  *See* GX 207B 23:04:18–39 (Hamisu waves and points, and police car drives past with sirens on within 20 seconds); *see also* Tr. 57 (waved at police car), 79–80 (Hamisu drove directly to arrest scene, without making any stops or speaking to any officers).  And as noted, Hamisu located and approached the arrest scene independently and identified Little without prompting.[9]

---

[9] Little urges the Court to discount Hamisu's testimony due to two ostensible "inconsistencies." Def. Ltr. Br. at 6.  Little faults Hamisu for an inexplicable delay in his arrival on the arrest scene, and for inaccurately stating that the arrest was on his right-hand side as approached.  *See id.* at 5–6.  In fact, the timing of Hamisu's arrival was unremarkable.  Surveillance footage showed that he drove south from West 128th Street onto Saint Nicholas Terrace at approximately at 10:39 p.m., *see* GX 207B 23:05:36 (time depicted in footage is roughly 26 minutes ahead of actual events, per GX301), and approached the arrest scene at 10:54 p.m., *see* GX202A 22:54:28. Little argues that this lengthy travel time leaves "15 minutes unaccounted for." Def. Ltr. Br. at 5. But after turning onto Saint Nicholas Terrace, Hamisu would have had to drive through a series of one-way streets—west on West 127th Street, south on Morningside Avenue, and east on Dr. Martin Luther King Jr. Boulevard—before turning onto Saint Nicholas Avenue. *See* GX101.  In traveling from West 128th Street to the arrest location, he would have driven through at least nine traffic lights, according to Google Maps street view. *Cf. In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 731 n.27 (S.D.N.Y. Apr. 6, 2017) (taking judicial notice of distances on Google Maps).  Hamisu also testified that he encountered traffic.  Tr. 79.  As for Hamisu's statement about the side of the street on which the arrest took place, Hamisu did not specify on which side of the street he parked his car; had he done so on the same side as the officers, the arrest would have been on his right-hand side as he approached—consistent with his testimony. *See* Tr. 63 (specifying only that he parked his car on Saint Nicholas Avenue and walked to the in-progress arrest).  In all events, even had Hamisu's memory as of the hearing been errant on this particular, that would not undermine his confident on-scene identification of Little as the man who minutes earlier had sought at gunpoint to steal his car.

That Rosas had already positively identified Little did not make obtaining an on-scene identification by Hamisu undue or unnecessary. The two identifications occurred about a minute apart in fast-moving circumstances. *See* GX201A 22:53:35 (Rosas identification); GX202A 22:54:29 (Hamisu walks up to arrest scene); GX301 (stipulation that timestamps on body camera footage are accurate). And the identifications were not cumulative: they related to different crimes—the armed holdup at Jimbo's, and the attempted auto theft. *See Walker v. Poole*, 547 F. Supp. 2d 238, 246 (W.D.N.Y. 2008) (consecutive show-ups permissible where crimes were "separate, distinct, and unrelated, and involved different witnesses"). And even if both civilians had linked Little to the same crime, an earlier identification, as the Second Circuit has held, does not make a later identification by a second witness unnecessary where the later witness had had a better or distinct opportunity to view the perpetrators. *Bautista*, 23 F.3d at 730 (contrasting later witness who had "several previous opportunities to observe suspects" with earlier witness, who "observed these suspects only as they ran from the apartment during the raid"). That logic applies here. Unlike Rosas, who viewed the perpetrator while masked and hooded, *see* GX205 00:14–1:46, Hamisu saw the unmasked robber and was able to observe the robber's hairstyle, Tr. 55 (describing braids), and face at close range, in a well-illuminated vehicle, Tr. 54–55 (Hamisu was in driver's seat while robber was in passenger's seat); Tr. 68 (car had an internal light that illuminated when the door opened).

Finally, Little's suggestion that Hamisu may have overheard Rosas's identification or even spoke to Rosas is speculative. *See* Def Br. at 5. No evidence supported this conjecture. On the contrary, Hamisu demonstrably did not approach the arrest scene until roughly a minute after Rosas had made his identification. *See* GX201A 22:53:35 (Rosas identification); GX202A 22:54:29 (Hamisu walks up to arrest scene); GX301 (stipulation that timestamps on body camera

footage are accurate).  Hamisu did not testify that he had heard Rosas's identification.  And body camera footage captures Rosas standing silently at a distance while Hamisu makes his identification.  *See, e.g.*, GX203A 22:54:48–55.  Nor does Little recite any evidentiary basis for the notion that the two witnesses conversed.  *See* Def. Br. 4–5.  On the contrary, Hamisu testified that he positively identified Little before speaking to anyone at the arrest scene.  *See, e.g.*, Tr. 81–82.

In any event, even if Hamisu had witnessed Rosas's identification, this circumstance would be a far cry from that giving rise to suppression in *United States v. Wade*, 388 U.S. 218 (1967), on which Little relies.  There, officers conducted a pre-planned lineup at which 100 witnesses identified the suspect in one anothers' presence.  *Id.* at 234.  Here, there is no evidence that officers planned either identification, let alone choreographed the two successively.  *Cf. Wade*, 388 U.S. at 234–355; *see also United States v. Nolan*, 956 F.3d 71, 81 (2d Cir. 2020) (criticizing officers' "highly irregular procedures" of allowing witnesses to discuss defendant's identification and view his photos on Facebook); *Bratcher v. McCray*, 419 F. Supp. 2d 352, 358–59 (W.D.N.Y 2006) (law enforcement showed the suspect to four witnesses at the same time).  On the evidence presented, had Hamisu overheard Rosas's identification, such was accidental.  *Cf. Brinson*, 2008 WL 4282617, at *8 (accidental overlap of *Terry* stop and neighborhood canvass made identification "much less likely to be suggestive or warrant condemnation as police misconduct") (collecting appellate cases).  Critically, as noted, the officers did not use any unnecessary words or take any unnecessary actions to "amplify the inherent suggestiveness of a show-up." *See Bratcher*, 419 F. Supp. 2d at 358 (unduly suggestive where officers needlessly caused four witnesses to identify defendant together).

The Court accordingly does not find anything unduly or unnecessarily suggestive about either identification—and, as noted, has not found either to result from a police-arranged identification procedure. The Court therefore does not have occasion to reach the second prong of the due process inquiry: whether the victims in question had an independent basis, other than the unnecessarily suggestive police-arranged identification procedure, on which to make a reliable identification. *See Rivera*, 2019 WL 6497504, at *5–6 (denying motion to suppress based on failure to prove unduly suggestive procedure); *Bautista*, 23 F.3d at 731 (affirming admissibility of pretrial identification where identification procedure was not unnecessarily suggestive).

## CONCLUSION

For the foregoing reasons, the Court denies Little's motion to suppress. The Clerk of Court is respectfully directed to close the motion pending at docket 17.

SO ORDERED.

Paul A. Engelmayer
Paul A. Engelmayer
United States District Judge

Dated: November 10, 2022
        New York, New York